UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

MATTHEW ALAN ALTLAND )
)
V. ) NO. 2:15-CV-215
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security )

MEMORANDUM AND ORDER

This matter is before the United States Magistrate Judge, with the consent of the parties and order of reference [Doc. 22] under 28 U.S.C. § 636 for final determination. The plaintiff's application for disability insurance benefits was denied by the Commissioner following an administrative hearing before an Administrative Law Judge ["ALJ"]. The plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 19], and the defendant Commissioner has filed a Motion for Summary Judgment [Doc. 25].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*,

745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff alleges that he became disabled under the Social Security Act on November 5, 2012. The plaintiff has applied for disability insurance benefits under the Act. His insured status expired on September 30, 2014. Therefore, he must establish that he became disabled on or before September 30, 2014 to be entitled to recover benefits.

The plaintiff's medical history is described in the Commissioner's brief as follows:

> In late February 2001, Plaintiff injured his neck and mid back at work (Tr. 214). A March 2001 magnetic resonance imaging (MRI) scan of Plaintiff's right shoulder was within normal limits and showed no evidence of a glenohumeral or rotator cuff abnormality (Tr. 202). A cervical spine MRI scan showed no evidence of posterior disc protrusion, spinal stenosis, or evidence of nerve root compression (Tr. 203).
> In September 2009, an MRI scan of Plaintiff's thoracic spine showed minimal degenerative changes without evidence of acute abnormality (Tr. 380). The next month, a cervical spine MRI showed mild disk degeneration at C5-C6 and C6-C7 (Tr. 422, 452-53). The lumbar MRI scan was normal (Tr. 431, 454).
> In February 2010, Plaintiff told Shawn Moyer, M.D., his primary care physician, that he had been experiencing months of right neck and shoulder pain that had prevented him from working (Tr. 305). He stated that he had seen neurology, neurosurgery, and orthopaedics, and had received epidural injections and physical therapy (Tr. 305). Plaintiff's physical examination was normal, with normal reflexes, strength, sensation, and gait (Tr. 305). Dr. Moyer diagnosed cervicalgia and referred him to neurosurgery (Tr. 305-06).
> In April 2010, Plaintiff underwent a neurological evaluation at Wellspan

2

Neurosurgery (Tr. 231). The examination indicated no focal radicular deficits in terms of sensation, power, or reflexes, and electrodiagnostic studies did not reveal cervical radiculopathy (Tr. 231, 422-24). Robert Schlegel, Jr., M.D., a neurosurgeon, noted that Plaintiff's cervical spine MRI scan did not show any nerve compression, disc herniation, or focal radicular deficit that would suggest the need for surgical intervention or any compressive etiology (Tr. 231, 425, 450). At that time, Dr. Schlegel suggested Dr. Moyer refer him to a rehabilitation physician or rheumatologist (Tr. 231). For himself, Dr. Schlegel opted to "take a step back and release this very nice gentleman to be seen as needed" (Tr. 231). A note in Dr. Moyer's file confirmed that Plaintiff had been discharged to be seen as needed (Tr. 295).

Plaintiff sought chiropractic care from East York Chiropractic Center in October 2010 and October and November 2011, for complaints of neck pain and low back pain (Tr. 278-79). He went to Swank Chiropractic and Rehab Center for chiropractic care 11 times in 2011 (Tr. 456-58).

In November 2011, Plaintiff sought care for right shoulder and neck pain from Orthopaedic and Spine Specialists (Tr. 502-03). An x-ray of his right shoulder showed only a slightly narrowed humeral acromial space; there was no evidence of shoulder pathology, rotator cuff, labral, or other nonspecific shoulder findings (Tr. 502). Upon examination, Plaintiff had tenderness in the paraspinal muscles, cervical spine, particularly in the right paraspinal muscles extending over into the trapezius (Tr. 502). He had no scapular winging or asymmetry and no muscle atrophy supraspinatus. infraspinatus, and deltoid (Tr. 502). His neck range of motion was 75 percent of normal with just stiffness at the extremes of motion (Tr. 502). Although he complained of stiffness and discomfort throughout the trapezius and anterior aspect of the neck extending down into the area of the clavicle and even sometimes in the chest wall and axilla, he had none of those symptoms at the time of examination (Tr. 502). All provocative testing of the shoulder showed no specific minimal symptoms, and he had full range of motion (Tr. 502). His motor, sensory, and reflex examination was intact (Tr. 502). The doctor concluded that the bulk of Plaintiff's symptoms seemed to be related to his degenerative cervical disc disease (Tr. 503). The doctor noted Plaintiff's 2001 shoulder MRI was not impressive (Tr. 503). He was referred to pain management (Tr. 331, 503).

Plaintiff obtained epidural steroid injections in December 2011 (Tr. 504-07). He reported improvement and sustained relief with the injections and the doctor recommended conservative treatment (Tr. 508-09, 631-32). Also in December 2011, Plaintiff obtained acupuncture treatment from Lillian Morgan, a licensed acupuncturist (Tr. 588). He said it was amazing and that he was so relaxed (Tr. 588).

In February 2012, Plaintiff went twice to Swank Chiropractic and Rehab Center for chiropractic care (Tr. 456). Plaintiff obtained acupuncture treatment from Ms. Morgan in February, March, April, and December 2012 (Tr. 584-87).

In May 2013, Plaintiff returned to Dr. Schlegel for a neurosurgical

3

consultation (Tr. 393). He reported that he was self-employed and previously set tile for a living (Tr. 393). He pursued painting and other activity, and had tolerated it fairly well (Tr. 393). He stated his neck pain and radiculopathy worsened in November 2012, but had significantly worsened in the past few weeks (Tr. 393). Neurologic examination showed some cervical muscle tightness in conjunction with a measure of right C6-C7 hypoesthesia and weakness in the right triceps, wrist extensor power and finger extensor power on the right plus right triceps hyporeflexia (Tr. 393). Although Plaintiff complained of grip weakness on the right, Dr. Schlegel had difficulty clearly identifying it (Tr. 397). There was no obvious pain and shoulder rotation (Tr. 396). Dr. Schlegel prescribed Flexeril, which Plaintiff had used in the past with good success, as well as Tramadol, which had also worked well (Tr. 393). At that time, Dr. Schlegel limited Plaintiff to lifting 10 pounds until he saw him again 2 weeks later (Tr. 393, 404). In the interim, Plaintiff sought chiropractic care one time (Tr. 456). He also sought acupuncture therapy one time (Tr. 576, 583).

      An updated cervical spine MRI in May 2013 showed severe stenosis of the right neural foramen at C6-C7 and moderate to severe stenosis of the left, and moderate stenosis of the neural foramina bilaterally at C5-C6, with no disc herniation or spinal canal stenosis (Tr. 398-99). Overall, Plaintiff's degenerative changes were worse compared to the 2010 MRI scan (Tr. 399).

      At his follow-up later in May 2013, Dr. Schlegel stated that he found no current evidence of C6 or C7 radiculopathy (Tr. 400). There was no spinal cord compression (Tr. 400). Neurological examination showed a measure of cervical muscle tightness with no focal radicular deficit in sensation, power, or reflexes identified (Tr. 400). Plaintiff reported no radiating arm symptomatology (Tr. 400). Again, Dr. Schlegel identified no problem that would lend itself to surgical intervention, and again he recommended referral to a rehabilitation physician or a rheumatology consult (Tr. 400). He did not continue Plaintiff's lifting limitation (Tr. 400).

      A few days later, Plaintiff returned to Orthopaedic and Spine Specialists Health (Pain Management Center) for neck pain and right upper limb pain (Tr. 513). He was able to ambulate and perform activities of daily living without devices (Tr. 513). Upon examination, Plaintiff's range of motion was grossly intact with minimal pain at end ranges (Tr. 514). He had positive Spurling bilaterally (Tr. 514). Axial compression did not elicit radicular symptoms but caused mild axial neck pain (Tr. 514). Sensation, strength, muscle tone, and reflexes were normal (Tr. 514). The doctor performed an interlaminal cervical epidural steroid injection (Tr. 515). Two weeks later, he reported 100 percent relief of upper limb pain and 60 percent relief of axial neck pain (Tr. 516). He continued to receive epidural steroid injections, with reported relief (Tr. 518-21). Examination by providers at the Pain Management Center indicated that axial compression did not elicit radicular symptoms, and sensation, strength, muscle tone, and reflexes were normal (Tr. 626). Plaintiff's range of motion was grossly intact with minimal pain at end ranges (Tr. 626). He had segmental tenderness in

4

the right cervical spine (Tr. 626).

Plaintiff returned to Swank Chiropractic in June 2013 (Tr. 456). Later that month, he switched to chiropractic care from Nichole Lehman, D.C. at Active Life Chiropractic, as he stated Dr. Swank's adjustments helped but were too aggressive (Tr. 459). He reported that he walked one to two miles each day (Tr. 459). He also participated in physical therapy for twelve visits in June and July 2013 (Tr. 538-57).

At the end of June 2013, Plaintiff filed a claim for disability with State Farm Insurance (Tr. 479). He claimed that his symptoms began in April 2013, and that he was self-employed in general construction at the time of his disability (Tr. 479). To accompany Plaintiff's claim, Dr. Lehman assessed that Plaintiff was unable to work at his regular occupation from May 9, 2013 to August 9, 2013, due to his condition (Tr. 482). She indicated he could not lift, push, pull, and bend (Tr. 482). She advised that she believed manual labor would worsen Plaintiff's condition (Tr. 482). She tentatively believed that following a trial period of chiropractic care, Plaintiff may be able to return to his regular occupation within one to three months (Tr. 482). Dr. Lehman performed chiropractic adjustments in June and July 2013 (Tr. 487, 495-501)

Also in July 2013, Dennis Grolman, M.D., one of Plaintiff's physicians at the Pain Management Center, evaluated Plaintiff's neck pain (Tr. 622-24). Plaintiff reported 70 percent relief from the epidural steroid injection in his neck and 10 percent relief in his shoulder and arm (Tr. 622). Upon examination, axial compression did not elicit radicular symptoms, and sensation, strength, muscle tone, and reflexes were normal (Tr. 623). Plaintiff's range of motion was grossly intact with minimal pain at end ranges (Tr. 623). He had segmental tenderness in the right cervical spine (Tr. 623). Dr. Grolman indicated that from July 12, 2013 to August 28, 2013, Plaintiff was limited to lifting, pushing, and pulling to 10 pounds maximum and limited reaching above shoulder level (Tr. 535, 624).

In August 2013, Plaintiff reported to the Pain Management Center that he could manage light weight if it was conveniently positioned (Tr. 603). Pain did not prevent him from walking any distance but he still had pain in his neck (Tr. 603). He could sit in his chair as long as he liked, but he needed a pillow to support his neck and head (Tr. 604). He could stand as long as he wanted, but looking up and down and side to side caused more pain (Tr. 604). He had tried pain killers, muscle relaxers, anti-inflammatory medication, ultrasound, massage, ice, exercise, and chiropractic manipulation, all of which helped a little, except for exercise (made it worse) and chiropractic manipulation (helped a lot) (Tr. 606, 609). Upon examination, Plaintiff had tenderness in the cervical spine in the midline, right paraspinal, right trapezial, and right interscapular region (Tr. 610). The cervical range of motion was diminished by 25 percent (Tr. 610). His upper extremity strength was grossly intact, as was sensation, and Hoffman signs were negative (Tr. 610). The provider indicated that Plaintiff had been able to return to work on July 12, 2013, doing modified job duties (Tr. 610).

Also in August 2013, Plaintiff returned for acupuncture treatment (Tr.

5

582). That month, Plaintiff cancelled his epidural steroid injection appointment because he was improving (Tr. 608).

In January 2014, Plaintiff sought chiropractic care from Elisabeth Clarke, D.C., L.M.T. (Tr. 668-69). He received four adjustments from Dr. Clarke in January and February 2014 (Tr. 674-78). At the end of February 2014, Dr. Clarke opined that Plaintiff could not return to his job as a tile setter as it would increase not only his symptoms but also contribute to further degenerative changes in his spine and increase the functional neurological deficits he was already experiencing (Tr. 673).

Sadie Ricker, Plaintiff's licensed massage therapist, wrote in an undated letter that she had been administering massages to Plaintiff since November 2013, focusing mainly on his neck and shoulders, working primarily on his trapezius muscle and levator scapulae (Tr. 679). She wrote that his range of motion in his neck and shoulder area were very limited (Tr. 679).

Also in February 2014, Serina Moore Scott, L.Ac., Plaintiff's acupuncturist, wrote a letter indicating that Plaintiff had received five acupuncture therapy sessions from her since November 7, 2013 (Tr. 671). She stated that Plaintiff rated his upper back neck, shoulder, and jaw pain as a 6 on a 10-point pain scale on a daily basis, and that the pain quickly escalated to a 10 with activity, especially when lifting his arms to the front (Tr. 671). Ms. Scott wrote that monthly acupuncture treatments helped to keep his pain under control so that he could perform activities of daily living, but that his pain was still easily exacerbated by lifting (Tr. 671). Plaintiff reported that his pain went from a 10 on a 10-point pain scale without acupuncture treatment, to a 3 up to 3 days after treatment, with pain at a level 5 to 6 between treatments (Tr. 682).

In March 2014, Ms. Scott completed a form concerning Plaintiff's physical abilities to do work-related activities, and specified that her responses were based on patient feedback (Tr. 683-88). She reported that Plaintiff indicated that he could lift and carry up to 20 pounds occasionally for a few minutes only, sit for one hour at a time and 3 hours total, and stand and walk for 8 hours at a time and 8 hours total (Tr. 683-84). He could not reach, push, or pull, but could occasionally handle, finger, feel, and operate foot controls (Tr. 685). He could frequently climb stairs and ramps and balance, occasionally climb ladders, ropes, or scaffolds, stoop, kneel, and crouch, but could not crawl (Tr. 686). He could not tolerate exposure to unprotected heights and vibrations, but could tolerate occasional exposure to moving mechanical parts, operating a motor vehicle, humidity and wetness, dusts, odors, fumes, and pulmonary irritants and frequent exposure to extreme cold and extreme heat (Tr. 687). Ms. Scott continued to provide acupuncture therapy treatments (Tr. 698).

[Doc. 26, pgs. 3-9].

The Court notes that adjudicative process prior to the hearing and ruling by the

ALJ in this District occurred in the Commonwealth of Pennsylvania. The Commissioner describes the administrative process utilized in Pennsylvania as follows: "[a]t the time of Plaintiff's application, he resided in Pennsylvania (Tr. 114). Pennsylvania is one of several test states participating in modifications to the disability determination procedures, which eliminate the reconsideration step in the administrative appeals process. See 20 C.F.R. §§ 404.906, 404.966, Program Operating Manual (POMS) DI 12015.100, available online at https://secure.ssa.gov/poms.nsf/lnx/0412015100 (Last visited Jan. 26, 2016). Plaintiff's appeal in this case proceeded directly from the initial denial to the ALJ level." [Doc. 26, pg. 2, fn. 1]. The Court mentions this only because it differs from the procedure utilized in Tennessee where State Agency physicians and psychologists examine the claimant's medical record and opine as to the claimant's residual functional capacity ["RFC"], and as to whether or not the individual is disabled. This type of review takes place at both the "initial" and "reconsideration" levels, and it is after denial of an application at the reconsideration level that a claimant may request review of the claim by an ALJ. The opinions of the State Agency physicians and psychologists are entitled to consideration as medical opinions. *See*, *Barker v. Shalala* 40 F.3d 789 (6th Cir. 1994), *Ealy v. Commissioner of Soc. Sec.* 594 F.3d 504 (6th Cir. 2010), and *Combs v. Commissioner of Soc. Sec.,* 459 F.3d 640 (6th Cir. 2006).

However, in the present case, the only review was at the initial level. More importantly, instead of being done by a State Agency physician, the review was performed by Rachel Vogel, an "SDM," which stands for "single decision maker." *See*,

7

20 C.F.R. § 404.906 (Tr. 56-58). The regulation seems to indicate that the SDM is not a physician, but can seek guidance from a medical consultant if deemed necessary. Here, the SDM opined that the plaintiff was not disabled, but had various postural and manipulative limitations. Of note is the SDM's opinion that the plaintiff was limited in bilateral overhead reaching. It is unclear whether the SDM was a non-examining medical source or a layperson. While it is clear that the SDM was charged with determining whether the plaintiff was disabled or not, her report was not discussed by the ALJ or the parties in the briefs, and will not be considered by this Court in determining whether the ALJ's findings are supported by substantial evidence.

The plaintiff was, and is, a younger individual under the regulations. He has a high school education. There is no dispute that he cannot return to any past relevant work with the RFC found by the ALJ.

The applicable administrative regulations require a five-step sequential evaluation process for the making of disability determinations. 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step ends the ALJ's review, see *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential review poses five questions:

> 1. Is the claimant engaged in substantial gainful activity?
>
> 2. Does the claimant suffer from one or more severe impairments?
>
> 3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the "Listings"), 20 C.F.R. Subpart P, Appendix 1?

8

> 4. Considering the claimant's RFC, can he or she perform his or her past relevant work?
>
> 5. Assuming the claimant can no longer perform his or her past relevant work — and also considering the claimant's age, education, past work experience, and RFC — do significant numbers of other jobs exist in the national economy which the claimant can perform?

20 C.F.R. § 404.1520(a)(4). A claimant bears the ultimate burden of establishing disability under the Social Security Act's definition. *Key v. Comm'r of Soc. Sec.*, 109 F.3d 270, 274 (6th Cir. 1997).

On September 14, 2014, the ALJ rendered his decision. He described the five-step evaluation process set out above that he is required to use in determining whether the plaintiff is disabled. He found that the plaintiff has a severe impairment of "degenerative changes of the thoracic and cervical spine." (Tr. 14). He found that the plaintiff met none of the "listings" of impairments set out in 20 C.F.R., Parte 404, Subpart P, Appendix 1 (Tr. 16). He then stated that the plaintiff had the RFC to perform the full range of sedentary work (Tr. 17).

In this regard, he described the plaintiff's testimony at the administrative hearing. Besides discussing the plaintiff's description of how his musculoskeletal condition affects his life, the ALJ noted that the plaintiff complained of indigestion, sleep apnea, and frequent migraine headaches (Tr. 17-18). The ALJ stated that he found that the plaintiff was not entirely credible in his subjective complaints (Tr. 18).

The ALJ then discussed the medical evidence. He noted the May 2013 MRI "which shows severe stenosis of the right neural foramen at C6-Cl and moderate to

severe stenosis of the left and moderate stenosis of the neural foramina bilaterally at C5-C6 with no disc herniation or spinal canal stenosis." (Tr. 18). He stated that plaintiff's treating neurosurgeon had noted cervical muscle tightness but no focal radicular deficit in sensation, power, or reflexes. The ALJ mentioned that the neurosurgeon also stated that there was no problem "which would lend itself to surgical correction." (Tr. 18). The ALJ continued by noting the conservative measures used to treat the plaintiff. He noted the opinions of the plaintiff's chiropractors as outlined in the medical evidence summarized above. The ALJ stated that the plaintiff reported improvement with treatment, and that "physical examination did not indicate any significant deficits in strength, sensation, and reflexes nor disabling limitations of function." (Tr. 18-19). He mentioned the opinion of the plaintiff's acupuncturist (Tr.19).

The ALJ then set forth his reasons for finding that the plaintiff was not fully credible. He pointed out that plaintiff's spinal problems had been dealt with conservatively. He stated that the side effects of plaintiff's medications were generally mild. He noted that there was no evidence of a need for surgery. There had been no emergency room visits or hospitalizations due to his spinal problems. He noted that the plaintiff's physical exams had shown no loss of sensation, power or reflexes. He mentioned the plaintiff's daily activities, which included simple meal preparation, shopping, taking walks, driving, and caring for a dog and a horse. The ALJ then stated that by limiting the plaintiff to sedentary work, he had accommodated all of the plaintiff's legitimate limitations caused by his musculoskeletal impairments (Tr. 19).

He then stated that he gave little weight to the assessments by the plaintiff's neurosurgeon, his chiropractors, or his acupuncturist. Likewise he stated that he considered, but gave little weight to, the statements by plaintiff's family and friends (Tr. 19-20).

He found that although the plaintiff could not perform any of his past relevant jobs with his RFC, there were a significant number of jobs in the national economy which the plaintiff could perform. He based his finding on plaintiff meeting all the requirements of Medical-Vocational Rule 201.28 [the "Grid"]. Accordingly, he found that the plaintiff was not disabled (Tr. 20-21).

Plaintiff asserts that the ALJ erred in failing by failing to properly weigh his subjective complaints by not finding him to be fully credible. The ALJ is the finder of fact in these cases. As the plaintiff acknowledges, the ALJ's credibility finding is entitled to great difference. However, the ALJ's finding must be based upon substantial evidence. *See, Cohen v. Sec. of H.H.S.*, 964 F.2d 524 (6th Cir. 1992). The plaintiff maintains that the ALJ "merely concluded that the plaintiff was not credible to the extent alleged." [Doc. 20, pg. 9].

The ALJ did not find that the plaintiff did not experience pain. He did not find that the plaintiff was fabricating all of his statements about his symptoms and limitations from those symptoms. In fact, he did find that "the claimant experiences pain…" (Tr. 19). However, the ALJ found that the plaintiff was not totally credible in his description of the extent of his pain and in how the pain limited his ability to function. The ALJ gave

11

several reasons for this finding.

First, he considered and thoroughly discussed the objective medical evidence (Tr. 18-19). An ALJ should consider whether complaints of disability are consistent or inconsistent with the medical evidence in the record. *Curler v. Comm'r of Soc. Sec.*, 561 F. App'x 464, 473 (6th Cir. 2014). This evidence discussed by the ALJ included the treatment records of Dr. Schlegel which in April 2010 did not reveal cervical radiculopathy. Also, an MRI done of the cervical spine at that time showed no evidence of any nerve compression, disc herniation, or focal radicular deficit which would indicate any need for corrective surgery. In May 2013, after a second MRI was ordered by Dr. Schlegel, it was again noted that there was no evidence of disc herniation or spinal canal stenosis, although there was some moderate to severe stenosis of the neural foramina. Again, Dr. Schlegel found no evidence of radiculopathy, and no problem was found that would lend itself to surgical intervention. The ALJ noted that Dr. Schlegel again recommended that plaintiff see a rehabilitation physician. The ALJ also considered the numerous physical exam findings which over the entire period prior to the expiration of plaintiff's insured status on September 30, 2014 showed no significant deficits in strength, sensation, and reflexes and no disabling limitations of function (Tr. 18-19).

Besides the lack of objective medical findings that would support the plaintiff's allegations of disabling pain and limitation, the ALJ also considered the conservative treatment plaintiff had received. Instead of surgery or other intensive treatment, the record shows plaintiff was treated by chiropractors, physical therapy, steroid injections,

massage and acupuncture. Conservative treatment can certainly be considered by an ALJ when gauging the credibility of an individual who claims to be totally disabled by those symptoms. *See, Branon v. Comm'r of Soc. Sec.*, 539 F. App'x 675, 678 (6th Cir. 2013). The ALJ also noted improvement reported by the plaintiff with this conservative treatment. Plaintiff even cancelled a follow-up appointment in August 2013 because of his improvement (Tr. 608).

Also, the ALJ considered the plaintiff's activities, such as taking walks, driving, caring for a dog and a horse, shopping and spending time with others, and found them not indicative of a person who was totally disabled (Tr. 19).

The Court notes that the ALJ found the plaintiff, a 37-year-old man, was capable of only sedentary work. This fact in and of itself shows that the ALJ gave the plaintiff considerable benefit of the doubt and found him credible to a certain extent. All in all, the Court finds that the ALJ did not abuse his authority as the finder of fact, and stated factual reasons for his finding regarding plaintiff's credibility. The Sixth Circuit has held that "[a]s long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess." *Ulman v. Comm. Of Soc. Sec.*, 693 F.3d 709 (6th Cir. 2012).

Plaintiff also asserts that the ALJ erred by not properly weighing the opinions of plaintiff's treating providers, "particularly those that were not physicians." [Doc. 20, pg. 8]. These providers were Dr. Lehman and Dr. Clarke, plaintiff's chiropractors; Ms. Serina Scott, Plaintiff's acupuncturist; and Dr. Schlegel, plaintiff's evaluating

13

neurosurgeon. The ALJ gave no more than little weight to any of plaintiff's medical sources. In this regard, he stated:

> As for the opinion evidence, little weight has been given to the assessments of Dr. Schlegel, Dr. Lehman, and Dr. Clarke because they are inconsistent with the totality of the medical evidence of record, and little weight has been given to the assessment of [Ms. Scott] because it is based upon the plaintiff's self-report and is inconsistent with the totality of the medical evidence of record…

(Tr. 19).

Under 20 C.F.R. § 404.1513(a), only Dr. Schlegel is an "acceptable medical source." Also, he is the only one as to whom the Commissioner is required to give "good reasons" for the weight given to his opinions. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514-515 (6th Cir. 2010). Dr. Lehman and Dr. Clarke, as chiropractors, and Ms. Scott, as an acupuncturist, are "other sources" under § 404.1513(d)(1). Plaintiff argues that even though they are not "acceptable medical sources," the ALJ must consider their opinions as "other sources" under 20 C.F.R. §404.1513(d) and Social Security Ruling ["SSR"] 06-3p. The Sixth Circuit has held that "[a]lthough the opinions of 'other sources' cannot establish the existence of a disability, their perspective should be given weight by the adjudicator and should be 'evaluated on key issues such as impairment severity and functional effects, along with the other evidence in the file.'" *Engebrecht v. Comm'r of Soc. Sec.,* 572 F. App'x 392, 398 (6th Cir. 2014) (citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007)). Also, "an ALJ has discretion to determine the proper weight to accord opinions from 'other sources.'" *Id.*

The plaintiff only makes a specific objection as to the ALJ's consideration of Dr.

14

Clarke and Ms. Scott. Even though they are not "acceptable medical sources," and even though the ALJ was not required to give "good reasons" for giving their opinions little weight, the ALJ thoroughly discussed their opinions. He clearly pointed to the medical evidence which led him to give Dr. Clark's opinion little weight. Also, Dr. Clarke's opinion itself, even if given more weight, does not support the plaintiff's claim of total disability. Dr. Clarke, after noting the results of plaintiff's MRI in May 2013, stated that "[i]n my professional opinion, Mr. Altland is unable to return to his job as a tile setter as it would increase not only his symptoms but also contribute to further degenerative changes in his spine and increase the functional neurological deficits he is already experiencing." (Tr. 673). No statement is given suggesting that the plaintiff cannot perform any work activity. The ALJ found that the plaintiff could not return to the tile setter job or any other past relevant work. Furthermore, he limited the plaintiff to sedentary work activity. The ALJ was free to give little weight to Dr. Clarke without giving a more thorough explanation, and the ALJ's RFC finding was not actually contradicted by Dr. Clarke's opinion.

With regard to Ms. Scott's opinion regarding plaintiff's limitations of function, the ALJ again found that it was at odds with the total medical record. He also found that it was not entitled to more weight because it was based upon what the plaintiff told Ms. Scott. Indeed, every page in the report states that it was "based on patient feedback." (Tr. 683-688). An ALJ as the finder of fact is justified in giving little weight to a report based solely on subjective complaints, even if it had come from a treating physician.

15

The plaintiff did not articulate a specific argument regarding the ALJ giving Dr. Lehman, his other chiropractor, little weight. However, Dr. Lehman's opinion, dated July 8, 2013, is not an opinion that the plaintiff is disabled from any work activity. Dr. Lehman opined that the plaintiff would be unable to perform his regular occupation as a construction worker from May 9, 2013, through August 9, 2013. She noted that this was because plaintiff was limited in lifting, pushing, pulling and bending. She also stated that "it is unlikely he will have a long career doing construction or manual labor." (Tr. 482). Once again, this does not suggest that the plaintiff would be prohibited from performing sedentary work. In any event, as with the opinion of fellow chiropractor Dr. Clarke, the ALJ considered Dr. Lehman's report and gave adequate reasons for rejecting any assertion therein that the plaintiff could not perform sedentary work.

The only treating physician to whose opinion the ALJ gave little weight was Dr. Schlegel, plaintiff's treating neurosurgeon. Dr. Schlegel had evaluated plaintiff in 2010. An MRI conducted at that time, along with his examination of the plaintiff, led Dr. Schlegel to conclude that the plaintiff had no need for any sort of surgical intervention. Dr. Schlegel released plaintiff to return as needed. When plaintiff was sent back to Dr. Schlegel on May 9, 2013, Dr. Schlegel asked plaintiff "to keep his lifting less than 10 pounds" until another MRI could be obtained to see if there was a cervical disc herniation (Tr. 393). Dr. Schlegel wrote a "to whom it may concern letter" stating that the plaintiff "may return to work on restricted duty" but was restricted until the scheduled follow-up visit on May 29, 2013, to lifting no more than 10 pounds (Tr. 404). The MRI revealed a

16

worsened condition when compared to the one performed in 2010, but showed no disc herniation or spinal canal stenosis (Tr. 399). Dr. Schlegel again found nothing which would lend itself to surgical correction and suggested either a rehabilitation physician or a rheumatology consultation. He released plaintiff from his care and made no mention of continuing the earlier restriction for plaintiff to limit his lifting to 10 pounds (Tr. 400).

As with Dr. Clarke's opinion, Dr. Schlegel's opinion does not appear to be at odds with the ALJ's finding of sedentary work. The only restriction imposed was to limit plaintiff's lifting to 10 pounds, which is the maximum weight lifting requirement for the performance of sedentary work. In any event, the Court perceives no error in the ALJ's handling of the records of Dr. Schlegel.

Plaintiff also argues that the ALJ erred in using the Grid. The Grid cannot be applied to satisfy the Commissioner's Step Five burden of showing that there are a significant number of jobs a claimant can perform if the claimant has significant non-exertional impairments, such as mental limitations, manipulative limitations, or environmental limitations. *See, Abbot v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990). In this regard, plaintiff points to Dr. Schlegel's statement in his treatment note of May 9, 2013 where he says "patient feels there is some element of grip weakness on the right but this is difficult for me to clearly identify." (Tr. 397). As stated above, Dr. Schlegel ordered an MRI which led him to conclude that there was no current evidence of cervical neuropathy and nothing treatable by surgery (Tr. 400). As set out in the medical records, numerous physical examinations both before and after the MRI showed normal strength,

17

muscle tone and reflexes, including the last exam in the record performed on January 30, 2014 (Tr. 695). Thus, there is substantial evidence for the ALJ's conclusion that there was not a significant non-exertional impairment which would preclude the full range of sedentary work.

The plaintiff obviously has severe impairments which preclude his performance of the hard physical labor he performed in the past. However, the evidence supports the ALJ's finding that the plaintiff was not disabled under the Grid. Accordingly, the plaintiff's Motion for Judgment on the Pleadings [Doc. 19] is DENIED, and the Commissioner's Motion for Summary Judgment [Doc. 25] is GRANTED.

SO ORDERED:

    s/ Clifton L. Corker
United States Magistrate Judge